May it please the Court, I'm Josephine Girard and I represent Monica Pilgreen in her application for Social Security Disability Benefits under Work Benefits, Title II. Just to bring us back down after all these complicated cases, we know that 20% of the population lives in the 9th District and 25%… And circuit. Sorry, circuit. And 25% of the cases, federal cases, are heard in the 9th Circuit. So Monica Pilgreen's case is a Social Security case and it deals with three different issues that are very rampant and we really ask the Court to please clarify them because they seem pretty obvious. The first issue is whether an ALJ can make a medical determination. The roles of the ALJ are to weigh the evidence and not stand in for a doctor. Social Security has provided a number of remedies. They have consultant doctors, they can subpoena a doctor. So the role of the ALJ is to be clear and weigh the evidence. In this case, the ALJ did not weigh the evidence. I'll bring it down very specifically, but let me just tell you the other two issues. The other issue is that Monica Pilgreen had the right to have all the evidence that was used by the ALJ before and we've had to defend this case without the whole record. The third one is that the Commissioner uses the Dictionary of Occupational Titles, that's their choice, it's researched by the Department of Labor, and the minimum requirement for a job is that you have basic arithmetic skills, basic mathematical skills, and basic language skills. That's the Commissioner's choice. The Commissioner has the burden of showing the jobs that the claimant meets this. Now I'm going to go specifically through this. Monica Pilgreen is someone who's worked her whole life. She has cognitive, physical, and psychological disability. There's no argument about that. She graduated from seventh grade, she's worked for her brother-in-law, helping with an apartment complex, and she developed peripheral neuropathy, and she has severe depression, she has fibromyalgia, she has a number of severe impairments. But what happened in this case was that her condition kept getting worse. So she applied for disability in 2013, and she was denied. She reapplied two weeks after the case was denied. She got a new application because she had these severe migraines and headaches that were becoming more and more debilitating, and her psychological state was getting really bad. She didn't want to leave the house, she had agoraphobia, she couldn't stand in line, she had panic attacks and depression. So because she had physical, mental, and cognitive problems together, it got very convoluted, and everyone got very confused when they made this decision. So what happened was, right before the hearing, four months before the second hearing, she couldn't see out of her eyes except for a tiny tunnel. She went to her doctor, and her doctor took her to quickly, had they had MRIs, and they realized that she had a pituitary tumor behind her eye resting on the optic nerve. It's the size, it's a macromedia tumor. Kagan. Sotomayor, this all goes to the fact that we don't know, the district, the ALJ found that there was – it wasn't clear that this was going to last for a year, or it wasn't established, and it wasn't established, was it? Well, the issue was that – Vernon wasn't. Okay, the issue is she's – in the first case and the second case, she's – and that's why the ALJ used that evidence – she's complaining about these severe migraines, and we're assuming that's in the head, and that the macromedia tumor that was removed – Oh, and the fact that he said, oh, the migraines are going to get better. Well, he certainly didn't have any basis for that, but – Right, and then the fact that this tumor is the size of a grape, we have to assume that it's not spontaneous. There's no evidence that you can have a macromedia tumor. So let me ask you this. What happened between the first and the second? There was, what, a four-month interregnum? She did not appeal from the initial denial. She brought another application four months later. She just reapplied. She heard it would be faster. All right, and so what happened that was different between the time that she –  The first and the second. All right. She had the pituitary problem with the eye, right? She had the pituitary problem. So she thought it was just increased migraines, increased fibromyalgia. That was what was different between the first and the second, correct? And her depression got very severe. And the depression. Those are the two things that were different. On the pituitary issue, I think that she has the burden of showing that this condition would sustain itself for at least 12 months, right? Well, she does have the burden of it, but then she has this extra issue that it has to have lasted or will last a year and a half. So if we take the time, if we use the migraines, which we don't have a medical expert to say that that tumor caused it, but since it's resting on the optic nerve and that's reasonable, I'm not a doctor, and the ALJ didn't use that. But the problem is there's no medical evidence either way about this. That's the problem. Right. There's no medical evidence. Why aren't we talking about the mental health evidence? How could we do that, please? Yes, I will. So we have one, the Social Security Center to Dr. Eitel. Dr. Eitel is a psychologist. She gave her complete full evaluation and found that because of her cognitive problems, she has a very, she can't basically read or write at a competent level and she can't count. So that issue was not before the ALJ the first time around. That's something that surfaced the second time, correct? I don't have the full record for the first case. I do have it for the second case. And so Dr. Eitel is part of the second case. So Dr. Eitel came the second time around. Right. And she evaluated her and I found it a little bit unusual because they never had a case before where the commissioner's doctor supported the claimant's position and was not followed. This is the first time I've seen such a case like this. I'm sorry? That Dr. Eitel's conclusion was disregarded or given little weight. I found that kind of unusual. You don't usually see that type of thing. I would think so since Social Security paid for Dr. Eitel to do an evaluation. And there's no other psychologist in the record that the ALJ is using. She was the only one. The others were consulting, not examining physicians. Right. They just looked at the initial records. So that's basically your argument, that there was no basis to disregard Dr. Eitel's conclusions based upon not examining physicians. Right. So we have two independent, the ALJ stepping in and making the medical determination and not addressing the medical... But also, it seemed to me that one of the basis for discounting Dr. Eitel was the notion that she wasn't being treated for mental health issues during this time period. She had been treated. And the IJ says, in addition, the claimant experiences symptoms caused by depression, panic disorder, or agora. They remain generally untreated for most of the period after the alleged onset date. But that's just not true. In fact, she was taking medication, right? Right. She was taking medication and it was... Right. All that helpful. She's doing her very best. And she also had no insurance. She had no insurance. And she moved from Texas to Arizona. So there was a whole lot of issue about why didn't she submit more evidence. She didn't have any insurance. So she couldn't have submitted it. If Judge Gould... I wanted to interject a question, if I may. What is your view as to what is the law as to when the agency could reject the view of a treating physician in favor of crediting the view of a consulting non-treating physician? Well, the recent case, the Ninth Circuit's always upheld the fact that a specialist and a treating physician have more weight unless the ALJ explains why. Now, in this particular case, the ALJ said, well, the psychologist used statements that Monica made. But a psychologist can't make an evaluation without talking to the client. That would be an impossibility because it is a mental situation. And a psychologist, part of their role is to document what their client said. They can't go in and say, well, you're schizophrenic. I just know it. They have to say, well, he said this and said that and said this. And then it also shows that you know. So it's part of their job. So to say that because Monica Pilgrim made statements to the psychologist and that's why it's not valid, that's not credible. So I think that's the agency will talk to you about it. Or at least he has to have a basis for, doesn't he, for discounting what you told him. Right. Right. The basis seems to be the notion that she wasn't getting treatment, but she was getting treatment. She was getting treatment. Right. Right. I mean, speaking to the court, that's what I, that is quite, I mean, the Federal Disabilities, the American Disabilities Act of 1984 states that ALJ, even if it was a non-severe mental issue, has to address that in the residual functional capacity. They have to. And he didn't. So that's, you know, that seems very clear. He did to some degree. He said that she had, you know, issues with, couldn't interact with the public and so on. Well, she's afraid to leave the house because of her physical problems, because she's afraid. And so we have the basic problem that that's on the record. She stated that there's no reason not to believe that. Dr. Rytel supported it. No one said they saw her out, you know, doing a job full time. That's something that needed to be addressed and was not and is required by. So ALJ's mental RFC said the following. Pilgrim retains the ability to understand, remember, and carry out simple instructions and tasks. Why is that not correct? Well, okay. So that's part of the mental health listings, A and B. So if you, I personally feel this is not a, this is a mental determination. But even if you don't meet the listing, because you know, you can do some things, but you can't, you have to show, the ALJ has to show that she could do it consistently for six hours a day, that she could, if you wash your clothes, you'd have to wash your clothes six hours a day. Or if you went out and, you know, rode your bicycle, you'd have to ride it six hours a day. So this court stated that repeatedly, that just because someone is able to live and function at home in a protective environment, that doesn't carry over to a job. And the ALJ's provided to the vocational expert. So we have this kind of case. I'm left not, her due process writes, without a full hearing. I don't know what was taken out, but I wasn't given the full case, and I asked for this at the district court, and they denied me the right to it. So, or my client's right. And so we have that, and then we have the problem with the Dictionary of Occupational Titles. She can't read and write at a level. She can't do basic math. And the issue is, well, they're saying, well, you know, she can count by twos, but so she can't count by threes. But basic arithmetic, you need to use twos and threes, and the Dictionary of Occupational Titles even requires you to multiply and divide at a basic level. So we have mental illness, the problem with the duration and her vision, and we don't have a record addressed. We don't have a what? I'm sorry. We don't have a proper record. I don't have the full record. I see. She was not given her rights. We're abused. So I'd like to stop, if possible, and answer your questions. Okay. Thank you very much. Good morning, Your Honors. May it please the Court, Joseph Landkamer on behalf of the Commissioner. I'd like to start with the Court's line of questioning, where we left off with Dr. Idle's opinion. The question — Judge Gould, I believe you asked, what is the standard that this Court applies to examining physicians such as Dr. Idle? The standard here is the ALJ has to provide specific and legitimate reasons. And the reason that is the standard is because we do actually have medical consultants on behalf of the State agency that have provided — But you have non-examining physicians, I think, if I read this correctly, that the consulting examination's conclusion, which says the following. She cannot sustain concentration and persist in work-related activity at a reasonable pace. She cannot maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public, or deal with normal pressures in a competitive work setting. Why is that not correct, and why should that not carry the day? So the ALJ — the reason that's not correct is because the ALJ provided specific and legitimate reasons for discounting those portions. And what were they? So on page 29 of the supplemental record, which is page 12 of the ALJ's decision, the ALJ goes through Dr. Idle's opinion and acknowledges that he's giving partial weight to the portion of Dr. Idle's opinion that states that she's essentially limited to simple routine work. And that is reflected in the RFC in this case. But then with respect to Judge Block, with respect to your question about the limitations that were discounted, this is what the ALJ says, and I'm reading from the top of that page, where Dr. Idle's limitation about being unable to concentrate, what the ALJ says is that it does not align with Dr. Idle's own findings on examination. For example, Dr. Idle said that Ms. Pilgrim can't sustain concentration. But during the examination itself, Dr. Idle reported that she could report four words right after hearing them, could remember her address and Social Security number. She could repeat three digits forwards and four digits backwards without errors. The ALJ refers to that in that paragraph there. The ALJ gives another reason, where about in the middle of that paragraph he states that the treating record does not support claimant's statements to Dr. Idle that she, quote, unquote, walks around 24-7 thinking I'm stupid and experiences excessive tearfulness and despair with suicidal ideation, so on and so forth. And the record supports that as well. Dr. Idle conducted a mental examination, asked lots of questions. She could do certain things. She could not do other things. But he made observations as the psychologist about her mental status. She was tearful. He observed her affect. She was able to recall certain things. He was being candid about this. He was not trying to, you know, pull the wool over anybody's eyes. But he did nonetheless conclude that her concentration was impaired. She could count by twos, but not sevens or threes. Yes, she could spell a word backwards. But he goes on to say that her abstracting ability was below normal. She was able to identify simple and medium similarities, but not complex similarities, cannot interpret common proverbs. So it looks like she conducted a full mental examination. Why should you not credit her final determination that she was a reliable informant, so to speak, and discredit that assessment? Because the ALJ provided specific and legitimate reasons for discounting the conclusions that Dr. Idle ultimately drew. But you say there's something internal in her assessment that countermanded her conclusion, and that's what you carried the day, so to speak. I would point the Court to two points that the ALJ was making. Number one, as Judge Block, as you pointed out, yes, there was an internal inconsistency. For example, Dr. Idle said that Ms. Pilgrim cannot concentrate. But there are findings within that report that are at tension with that, and that's with respect to some of the mental testing that the ALJ points out here. And under this Court's Bayless decision, that is a valid reason for discounting an examining source opinion. I would draw the Court's attention also to the treatment records, which the ALJ pointed out did not support all of Dr. Idle's conclusions as well, which — Sotomayor, I wondered about that. I mean, that seems extremely questionable. I mean, this woman had had mental health treatment, including psychotherapy, and many several different kinds of psychiatric medications. She was still on the psychiatric medications. She did report suicidal ideations at different times. The fact that she didn't report them, sometimes she didn't, doesn't prove that she didn't have them now. It was consistent, at least, with the past. But more — but — and she didn't have health insurance, which she never mentions as to why she didn't have psychotherapy. That was — she was asked that, and I believe that's what she said. I don't have any health insurance. So — and I know we have case law saying that that can't be held against somebody. So it isn't true that she didn't have mental health treatment. She was taking four different kinds of medication. And she said they didn't do it. No, you're absolutely correct, Judge Berzon. The — but the ALJ's findings is a bit more nuanced than that. What the ALJ said is that the treatment records don't support the level of impairment that this one-time examiner, Dr. Eidel, found. And to your point, Judge Berzon, yes, there's no question that Ms. Pilgrim has experienced mental health issues. I'm dating as far back to, I think, 2013. But the crucial question before this Court is, as of January 27th, 2015, through the date of the ALJ's decision, what were her mental impairments? What were the functional limitations? Because a lot of — there's a lot of citation in this case to older records that — from a previously adjudicated period. And if you look at, for example, Exhibit 1A in the record, that's the — that's the old ALJ's decision. And he addresses — But what difference does that make in terms of whether Judge Eitel — Dr. Eitel's current report, which was not in the old record, is supported by past records? I mean, I — we're going to change — if there hadn't been an earlier application, we certainly would have considered those records. And so why don't we consider them now? Because when you read — because it's a prior adjudicated period that is final and as of — as of the — But so what? Those same records were in this record, as I understand it. And he — Dr. — and the ALJ did go through them. And you can't discount them as being relevant to whether Dr. Eitel's opinions were supported by the record. They were certainly supported by the fact that, you know, in the not very distant past, she did have psychotherapy and she did have report suicidal ideation, and she had — was prescribed all these different kinds of medication. So why — why are we discounting those things? At least to the degree as they support Dr. Eitel. Because that — those records were already in front of a different ALJ. But Dr. Eitel's record wasn't. So in other words, they weren't connected up to anything. But now, if you're going to discount Dr. Eitel because there isn't a record, there is a record. There is a record. There is a record from the prior case. And those — those symptoms during that time frame up through January 26, 2015, were already adjudicated. So whatever her — and I will answer the objection. Do you think there's a racial or a claim preclusion kind of problem here? There is. There is not a — the judge expressly declined to reopen that old application. And therefore, that is a final agency decision. So the question in this case is really, it's whether or not she — Sotomayor, I'm a little confused. I don't think there's a prior adjudication of her mental condition in the first proceeding, was there? There was, Your Honor. If you look at — and I'll direct the Court to the ALJ's first decision, and we can look at what her allegations were. So on page — starting on page 94, S.E.R., Ninth Supreme Court record 94, that's the ALJ's — that's the former ALJ's decision, I think. Let me just — let me just make sure I have this correct. Yes. That is the prior ALJ's decision. And that's through January 26, 2015. And when we look at — Was there any examination of her mental condition in the prior — by consultative examiners, by the commissioner, or anybody else? There was examination of her mental capacity. If we look on page 99, for example, a lot of her allegations — By whom? There were — let me see here. So here's a — on page 100, and again, this is from the old decision. This is about a prior adjudicated period. But it says that she — that there was a mental status examination that Miss — that somebody named Miss Smith conducted. There's opinion evidence from State agency experts. Was there a final adjudication as to her mental status in the prior proceeding? I don't see that. Maybe there is, but I don't see it. If I could direct the — Judge Block, if I could direct you to the findings that — some of the findings that the LJ is making there. The LJ actually found — again, this is the old decision — that she had major depressive disorder. And the LJ looks at all of her allegations from 2013 through January 26, 2015, and actually affords her — he limits her to — finds that she doesn't have disabling mental conditions, but instead limits her to include some mental limitations in the RFC. So, yes, to your question, there was an adjudication about what her mental symptoms were up through January 26, 2015. Kagan. But the LJ in the current case went through all of those old records. He didn't say they're not pertinent. He recited them all. He did recite them for context, correct. Right. So that's the question. For context, in terms of whether they support Dr. Itell, I mean, are we — it's not pertinent that these records at least do indicate that she did have psychotherapy and she was treated for mental health illness? Because the — I mean, where I get stuck is where he says that she wasn't getting mental health treatment. I don't understand that. Lack of significant mental health treatment. You're referring to the LJ's decision? Yes. There was a lack of significant mental health treatment during the period. Taking four different kinds of mental health — of psychotropic medication isn't mental health treatment? I think what the LJ was referring to was the lack of mental health treatment during the relevant time in this case. But she was taking it at that time. She was. And let's — and I would like to direct the Court to some of the mental findings during the relevant timeframe in this case. So, in early January 2015, this is right before the relevant timeframe in this case, she added — she was alert, conversational, normal memory, appropriate effect. She said she was doing well on medication. That's on page 649. February 2015, she had a normal mood. That's on page 706. December 2015, this is right before the LJ's decision, she reported, quote, unquote, mild anxiety and depression. That is — that is out of line with what Dr. Idol found earlier in the year with respect to how she couldn't concentrate, she couldn't be around people. If — if she has mild anxiety at that point, regardless of whether or not she was seeking regular treatment, regardless of what medication she was on, if it — the LJ's decision on this point was supported by substantial evidence. That was a specific and legitimate reason that the LJ referred to. Judge Gould, if I could interject before you complete. I'd like to take you back to the legal standard for when — when the ALJ could credit a consulting agency doctor over an examining physician. You argued that he could do so here because there were, I'll quote, I think I'm quoting your language, specific and legitimate reasons to do so. So the issue that's troubling me is that I thought that there were some cases that on the issue of — of crediting consulting agency doctor over an examining doctor when the first person didn't examine the patient, that there had to be clear and convincing reasons. So are there cases with that clear and convincing standard in this context? Or is it all specific and legitimate? It is specific and legitimate. The Court's case law on this is clear. If there is a contradictory — if an examining doctor like Dr. Idle in this case, if there are contrary medical opinions that call that opinion into question, those — it can be a non-examining State agency doctor that triggers that specific and legitimate standard, which is lower than the clear and convincing. But I would point out, Judge Gould, that regardless of what standard is applied here, the ALJ did provide valid reasons why he was not crediting all of Dr. Idle's opinion. So how will you distinguish this case from the recent Ninth Circuit decision in Buck? When I read that, it seems to be pretty close to the firing line here. And I refer — I assume, Judge Block, you're referring to the language in Buck where it talks about the difference — how with a mental status examination, you are necessarily relying in part on subjective complaints. And it's true. That is exactly what Buck says. But Buck is distinguishable on its facts. And the reason is because of this. In Buck, the ALJ found that the doctor partially relied on subjective complaints, and those were the facts in Buck. The facts in this case, what the ALJ found was that it seemed that Dr. Idle largely relied, if not solely, on the complaints. Sotomayor, is there a part of it between a partial reliance and a total reliance? That's what the law ought to be? Correct. And the Court's Tomasetti case, the Court's Thomas case, they reiterate that where a claim is a claimant, the doctor strongly relies or substantially relies on the allegations. That is a valid basis. And I would point out, though, even if that — even if the Court disagrees with that interpretation of Buck, the ALJ did provide other valid reasons here. What about the — in answer to Judge Gold's question, our bailiff's opinion in 2005 says, to reject an uncontradicted opinion of a treating or examining doctor, it's because it says uncontradicted. Is that why? Correct. Correct. An ALJ must state clear and convincing reasons. And this is contradicted by people who didn't examine her but simply read her records. Reviewed records and offered an opinion. That would be the State agency medical consultants. I don't understand how somebody can make a psychiatric determination by reading a record. It seems completely phony, actually. I mean, it's — I mean, they are medical. There are medical opinions in the record that the ALJ is required to consider. So I see my time is up. If the Court has any other questions, I would ask that the Court affirm the ALJ's decision. Thank you. Your Honors, I think that, you know, we can see the issue here is that there really isn't any psychological evidence that's opposed to Dr. Eitel. The ALJ picked items out of Dr. Eitel's evaluation and holds them separately. But an evaluation is a complete statement. What's underlying this whole situation is that the Commissioner argues that the case was erased judicata. But the Commissioner's own rules say that a case where there's a new impairment or a whole year, a case can be reopened. The ALJ used the records, discussed the situation, and now we're supposedly to ignore medical records, which were only a year previously or two years previously. And you can't — Let me interrupt, with all due respect. I sense that your adversary's position is that Dr. Eitel's conclusions can be discounted because there are some internal inconsistencies in her report. And I think that's what he's arguing. What do you say about that? I'm saying you can't pick apart a record and that because someone can count backwards does not mean that their evaluation is inconsistent. A psychologist has to report everything. And as we know, different mental conditions can produce — For instance, Monica Pilgrim is an extremely nice social person. But she can't perform and she isn't. But to some extent, Dr. Eitel was faithfully reporting things that could be perceived as both negative and positive. But nonetheless, her conclusion was that she was really not able to function. Yes, yes. I definitely think that you don't have to never be able to count anything and still be depressed. I don't personally see this as inconsistent. But the fact, this whole fact of reopening and not reopening the case because a client wanted to get benefits faster and quickly went and reapplied, I think this Court would be really helpful if you would remand this case for immediate benefits, because this type of situation needs to get cleared up if the commissioners What do you mean? Okay. I didn't understand the timing question. Okay. So the commissioner says in the regulations that any time within a year, a claimant for good cause, the case can be reopened if your condition gets worse, because that's a new situation. And then the whole case is reviewed again, and that's commonly done. The commissioner made that stand because of this. Otherwise, we would have — no one would be able to have medical records. They would only have to have all their medical records from that date on. It's not — it's not logical. A person's condition often doesn't get discovered maybe immediately. What difference does it make if it's reopened? On this case, it makes a big difference because the commissioner's whole argument is based on the fact that those medical records, you can't look at them because they're part of the previous case. Well, but the LJ did look at them. We know he looked at them. And I'd say that's why. I mean, I don't understand why I had understood that reopening the old one meant that you would go back to the earlier filing date, but you — even without reopening, that doesn't tell you that you just take the records that are in the record and — if they're reintroduced in the record, and just throw them out. And the LJ didn't do that, either. He didn't throw them out. He may have misused them, but he didn't throw them out. I agree with you. But the commissioner argues throughout his brief that you can't look at them. But nobody's found that in this case. I mean, he's arguing something that's not really a finding of the agency. I agree. A holding of the agency. I agree. I mean, I agree. Okay. Thank you very much. Thank you very much. Thank you. The case of Pilgrim v. Berryhill is submitted, and we are in recess. Thank you.
judges: Gould, Berzon, Block